UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

CASE NO. 18-1302

YURY RINSKY

*Plaintiff, Appellee*

v.

CUSHMAN & WAKEFIELD, INC.

*Defendant, Appellant*

---

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MASSACHUSETTS

# BRIEF OF APPELLEE YURY RINSKY

Mark D. Szal,
No. 1183731
SZAL LAW GROUP LLC
6 Liberty Square #330
Boston, Massachusetts 02109
Telephone: (617) 830-2494
mark@szallawgroup.com

John W. Dennehy, P.C.,
No. 122802
DENNEHY LAW
127 Main Street, Suite 1
Nashua, NH 03060
(603) 943-7633
(603) 943-7642 (Fax)
jdennehy@dennehylaw.com

Date: September 6, 2018

# I. TABLE OF CONTENTS


I. TABLE OF CONTENTS....................................i-ii

II. TABLE OF AUTHORITIES................................iii-v

III. REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD...........vi

IV. STATEMENT OF THE CASE...............................1-7

A. FACTUAL BACKGROUND...............................1-6

B. PROCEDURAL BACKGROUND............................6-7

V. SUMMARY OF THE ARGUMENT.............................7-8

VI. ARGUMENT...........................................8-30

A. The District Court Properly Exercised Subject Matter Jurisdiction And Applied The NYCHRL At C&W's Request.........................................8-19

i. There Can Be No Dispute The District Court Had Subject Matter Jurisdiction.........9-10

ii. C&W Is Estopped From Arguing That Rinsky Was Not A New York City Employee Entitled To Protection Under The NYCHRL............10-13

iii. Subject Matter Jurisdiction Is Not A Question For The Jury..................13-14

iv. Despite C&W's Waiver, Rinsky Satisfied The Impact Requirement For New York City...14-17

v. Application Of Massachusetts Law Would Have Yielded The Same Result................17-19

B. The Jury Was Properly Instructed On The Law......19-25

i. The Court's Causation Instruction Was Correct...............................20-22

ii. The Court's Punitive Damage Instruction Was Correct...............................22-23

iii. Rinsky's NYCHRL Claim Was Properly Pled....................................23-25

C. The Verdict Was Consistent With The Weight Of The Evidence........................................25-30

VII. Conclusion..............................................30

VIII. Fed. R. App. P. 32(g)(1) Certificate of Compliance

IX. Certificate of Service

X. Addendum

## II. TABLE OF AUTHORITIES

**Cases**


Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23(1st Cir. 2004).....................................11,12

Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789(App. Div. 2013)...........................................20,21

Calhoun v. Cnty. of Herkimer, 980 N.Y.S.2d 664(2014)..........21

Chambers v. TRM Copy Centers Corp., 43 F.3d 29(2d Cir. 1994)..............................................27

Chauca v. Abraham, 30 N.Y.3d 325(2017)....................22,23

Conjugal P'ship v. Conjugal P'ship, 22 F.3d 391(1st Cir. 1994)..............................................25

Dimanche v. MBTA, 893 F.3d 1(1st Cir. 2018)................25,26

Franchina v. City of Providence, 881 F.3d 32(1st Cir. 2018)...........................................20,22

Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228(S.D.N.Y. 1999)..............................................29

Guay v. Burack, 677 F.3d 10(1st Cir. 2012).................11,12

Hoffman v. Parade Publications, 15 N.Y.3d 285(2010)........14-16

Holleman v. Art Crating Inc., 12 CIV. 2719 VMS, 2014 WL 4907732 (E.D.N.Y. Sept. 30, 2014)...................................21

Latin Am. Music Co. v. Am. Soc. of Composers Authors and Publishers, 593 F.3d 95(1st Cir. 2010).........................5

Lund v. Henderson, 807 F.3d 6(1st Cir. 2015)..................26

Luria Bros. & Co. v. All. Assur. Co., 780 F.2d 1082(2d Cir. 1986)..............................................24

Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162(1st Cir. 2005)..............................................26

Melman v. Montefiore Med. Ctr., 98 A.D.3d 107(N.Y. App. Div. 2012)........................................................27

Michalski v. Home Depot, Inc., 225 F.3d 113(2d Cir. 2000).....22

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, (2nd Cir. 2013)...........................................14,21

Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164 (1st Cir. 2009)...............26,29

New Hampshire v. Maine, 532 U.S. 742(2001).................11,12

Otis v. Arbella Mut. Ins. Co., 443 Mass. 634, 646 (2005)......12

Paterakis v. Andrew Najda, et. al., 93 Mass. App. Ct. 1103(2018)...................................................18

Prou v. United States, 199 F.3d 37(1st Cir. 1999)..............9

Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000)......................................................27

Robles v. Cox & Co., 841 F. Supp. 2d 615(E.D.N.Y. 2012).......15

Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36(1st Cir. 2002)......................................................26

Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168(1st Cir. 1995)......................................................24

Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429 (E.D.N.Y. 2013)............................................20

Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121 (1st Cir. 2004)......................................................23

Sass v. MTA Bus Co., 6 F. Supp. 3d 238 (E.D.N.Y. 2014)........21

Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23(1st Cir. 2015)......................................................20

Taylor v. Seamen's Soc. For Children, No. 12-CV-3713, 2013 WL 6633166 (S.D.N.Y. Dec. 17, 2013)............................21

Trainor v. HEI Hosp., LLC, 699 F.3d 19(1st Cir. 2012).........26

United States v. George, 676 F.3d 249 (1st Cir. 2012)..........8

Uphoff Figueroa v. Alejandro, 597 F.3d 423(1st Cir. 2010).....23

Wagenmann v. Adams, 829 F.2d 196(1st Cir. 1987)...............26

Wexelberg v. Project Brokers LLC, 13 CIV. 7904 LAK MHD, 2014 WL 2624761(S.D.N.Y. Apr. 28, 2014)...........................15,16

**Statutes**

28 USC § 1332.........................................9

28 U.S.C.A. § 2111.................................17,22

G.L. c. 151B.......................................18,19

New York City's Human Rights Law ("NYCHRL"). New York City Admin. Code § 8-101 et seq...............................passim

**Other Authorities**

Fed. R. Civ. P. 15.................................24,25

## III. REASONS WHY ORAL ARGUMENT NEED NOT BE HEARD

Pursuant to Local Rule 34.0, Appellee, Yury Rinsky, states that oral argument in the instant appeal need not be heard because (1) the dispositive issues have been authoritatively decided, and (2) the facts and legal arguments are adequately presented in the briefs and record, such that the decisional process would not be significantly aided by oral argument.

## IV. STATEMENT OF THE CASE

### A. FACTUAL BACKGROUND

Yury Rinsky ("Rinsky") began working for Cushman & Wakefield, Inc. ("C&W") in 1988. A.374.[1] Rinsky's area of expertise was the AS/400 computer system. A.375. In 2015, C&W started to phase out the AS/400 system. A.377. Beginning in 2012, C&W told Rinsky to work remotely because of a space issue in the New York City office. A.383-384. Between 2012 and 2015, Rinsky typically worked remotely three or four days per week, spending one or two days per week in the New York City office. A.385. C&W did not restrict where Rinsky performed remote work, and he reported to the New York City office at all times. A.393.

Rinsky, who was 63 years old at the time of his termination, planned to retire when he was 66 or 67. A.389. He and his wife purchased an investment property in the Boston area in 2014, intending to fix it up and rent it until Rinsky's retirement. A.391. Rinsky requested approval from C&W for a transfer to Boston at the end of March 2015 after learning transferring was a possibility. A.398. Rinsky asked his manager, Colin Reid ("Reid"), but was told that Reid was busy and unable to talk about the request at that time. A.398-399. Rinsky spoke with Reid again a few days after receiving an offer on his

---

[1] References to the Appendix of C&W are in the form of A.(page number(s)).

house. A.401-402. He again asked for approval to transfer to Boston. A.403. Reid told him that he approved, especially given the fact that Rinsky was already working remotely about half of the time, but that Reid also needed to talk to his manager, Andrew Hamilton ("Hamilton"). A.403. Reid did not explain that any other process or approvals were necessary. A.404.

A few days later, Rinsky followed up with Reid; he was told that Reid had not spoken with Hamilton yet because everyone was busy. A.406. About four days later, Rinsky again spoke with Reid, who told him that Hamilton had approved the transfer. A.406-407. Rinsky was told that Global CIO Craig Cuyar ("Cuyar") would call to obtain office space for him in Boston. A.407-408. At this point, Rinsky understood that his transfer request was approved. A.408.

Rinsky continued to work business as usual in New York City after learning of the approval of his transfer. A.408. Upon learning of the closing date for the sale of his house, Rinsky emailed Reid on Sunday, May 17th, informing him that he would be moving to Boston on May 27th. A.408-409. Reid responded, "OK, we will talk on Tuesday." A.410-411; Appellee's Addendum ("App. Add.") p. 1.[2] Rinsky met with Reid on Tuesday; they discussed

[2] To avoid over designation of the record where the complete record is available to the Court and may be relied upon whether or not included in Appellant's Appendix, Appellee provides as an addendum to his brief five trial exhibits pursuant to Local Rule

logistics concerning the transfer. A.411-412. On May 22nd, Rinsky's last day of work in the New York City office, Reid met with Rinsky to go over his list of tasks for June. A.413. Rinsky then made the rounds, saying goodbyes to co-workers before leaving. A.413. Rinsky closed on the sale of his house on May 25th and moved to the Boston area two days later. A.414-415. During the period between Rinsky's May 17th email and his departure for Boston on May 27th, no one ever told Rinsky that his transfer was not approved or that he risked termination by moving to Boston. A.561.

Even before Rinsky left New York City, however, C&W was engineering Rinsky's termination. Even before Rinsky's May 17th email, Hamilton was discussing terminating Rinsky. A.823-824; App. Add. p. 2. The same day Reid met with Rinsky to discuss the logistics of his transfer, he was meeting with Hamilton to discuss terminating Rinsky. A.823-824. The next day, Reid solicited Edgardo Felix ("Felix") to replace Rinsky. A.841-843. On Rinsky's last day in the New York City office, Reid and Hamilton set up a meeting for the following week to discuss the logistics of Rinsky's termination. A.825. That meeting ultimately resulted in the formulation of a plan on how C&W would terminate Rinsky.

---

28(a)(2) for the Court's convenience and where these other items are necessary for understanding the specific issues on appeal.

Unbeknownst to Rinsky, on the day he was leaving the New York City office for Boston, C&W was putting together a specific plan to (1) replace Rinsky with Felix; (2) begin knowledge transfer between Rinsky and Felix; (3) process Rinsky's transfer and retain him for about nine weeks to cover important work; and (4) then terminate him while "mitigating litigation risks." A.557-560; A.825-827; App. Add. p. 3.

Upon arriving in the Boston area and obtaining Internet access, Rinsky emailed Reid a day earlier than expected and began to work remotely. A.415-416. Shortly thereafter, an employee of C&W emailed Rinsky to ask if he still needed his desktop computer in New York City. A.421-422. Copying Reid on the email, Rinsky responded saying he would need it when he obtained space in the Boston office in a couple of weeks. A.422. Reid replied to all, copying Hamilton, stating that Rinsky "might be getting new equipment in Boston." A.422-423; App. Add. 4-6.

During June, Rinsky had daily interactions with Reid by email and phone, which were "business as usual." A.427-428. During this time, Rinsky worked fourteen-hour days, six days per week. A.420-421. Rinsky was invited to participate in a conference call with Reid and Hamilton on June 22nd. A.429. During the call, Hamilton angrily told Rinsky that he needed to report to New York City the next day, and work in the New York

City office five days per week; if he did not, he could either resign or he would be terminated. A.430-433. Rinsky was later sent an email with the text of a resignation letter; Rinsky refused to resign. A.434-436. After a period of review by C&W, Rinsky was terminated per a letter from Reid emailed to him on June 14th, which contained numerous false statements. A.446-451.

All of the decision makers concerning Rinsky's employment were in their 40s, significantly younger than Rinsky. Neither Hamilton, a current employee of C&W, nor Cuyar, a former employee of C&W working in New York City, were called to testify at trial.[3] Rinsky's replacement, Felix, was approximately 48 years old at the time of Rinsky's termination. A.428.

Evidence was also introduced at trial that during the relevant period, another younger employee (Jay Leiser) had sought a transfer to Florida because his wife was starting a dental practice there. Cuyar stated in an email that he wanted to handle the transfer requests differently. With Leiser, he wanted to address his compensation because Leiser was moving to a state with a lower cost of living; in contrast, he ordered

---

[3] Rinsky did not seek an absent witness instruction, although one would have been appropriate. See Latin Am. Music Co. v. Am. Soc. of Composers Authors and Publishers, 593 F.3d 95, 101 (1st Cir. 2010). The instruction "informs the jury that a party's failure to produce a particular witness may justify the inference that the witness' testimony would have been unfavorable to that party." However, the jury may have properly made that inference on its own.

that Rinsky be terminated. A.722-724. Later, when Rinsky's prospective termination had become a legal issue, Cuyar ordered that no one would be allowed to transfer in order to "eliminate potential employment disputes and litigation." A.670-671; App. Add. 7-11. After the dust had settled, however, Leiser was transferred to Florida and currently manages a team in India, while Rinsky was terminated. A.735-736.

## B. Procedural Background

Rinsky filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination, later removing the Charge to Middlesex Superior Court. C&W removed the lawsuit to the District Court, invoking the District Court's diversity jurisdiction. After completion of discovery, C&W moved for summary judgment under Massachusetts law, which was denied. C&W then demanded that New York law be applied at trial. In its request, C&W failed to alert the District Court that in addition to state discrimination laws, the New York City Human Rights Law ("NYCHRL") is available to New York City employees. When alerted to this by Rinsky's counsel, and given that it was C&W's position throughout the litigation and at trial that Rinsky was always an employee of New York City, never permitted to transfer from New York City, and was terminated for "abandoning" his job in New York City, the District Court applied the NYCHRL to

Rinsky's age discrimination claim.[4] Based on the evidence, the jury returned a verdict in favor of Rinsky on his age discrimination claim and awarded him $1.275 million in compensatory and punitive damages.[5] In a thorough twenty-two-page decision, the District Court denied C&W's motions under Fed. R. Civ. Pro 50(b) and 59, and C&W appealed.

## V. SUMMARY OF THE ARGMUMENT

The so-called "impact rule" applies solely to the issue of subject matter jurisdiction, which C&W waived when removing the matter to the District Court and through its requested application of New York law. C&W seeks to conflate the impact issue into obscure applications in an attempt to confuse the Court and disrupt a sound verdict that was upheld in a lengthy and comprehensive post-trial decision.

For instance, C&W assets that the impact of Rinsky's harm occurred in Massachusetts, while all through the underlying litigation it took the position that Rinsky was always employed in C&W's New York City office. C&W inexplicably asserts that the impact was in Massachusetts despite the fact that it sought and obtained application of New York law under a conflicts of law request. At no point in its brief does C&W attempt to explain how New York state law could apply to the case without the New

[4] Rinsky's other common law claims were dismissed before trial.
[5] On September 6, 2018, the District Court awarded Rinsky pre-judgment interest and $286,007.77 in attorneys' fees and costs.

York City statute being applicable, especially where Rinsky reported to C&W's New York City office at all times, and Rinsky was never staffed or reported to any New York location outside of New York City. Further, C&W improperly attempts to transcend the impact issue into an element of a discrimination claim, which simply is not the case.

C&W's jury instruction argument is simply a repackaged choice of law argument, and yet another attempt to distract the Court's attention from the fact that the jury's verdict was overwhelmingly supported by the weight of the evidence at trial.

## VI. ARGUMENT

### A. The District Court Properly Exercised Subject Matter Jurisdiction And Applied The NYCHRL At C&W's Request.

C&W's "fast and loose" jurisdictional and choice of law arguments can most aptly be described as a proverbial "Hail Mary pass...made in desperation at the end of a game, with only a small chance of success." United States v. George, 676 F.3d 249, 251 (1st Cir. 2012). C&W removed the lawsuit to the District Court, stating that it had subject matter jurisdiction under principles of diversity. C&W took the position through trial that Rinsky was always its employee in New York City. Now, after losing at trial, C&W takes directly inconsistent positions, claiming the District Court should not have heard the case and that New York City law could not apply to Rinsky. It

also claims that the jury made a factual finding that it did not with respect to discriminatory "impact." Any claimed error was harmless in any event, where the substantive law and damages awarded would have been the same under the NYCHRL and Massachusetts law.

**i. There Can Be No Dispute The District Court Had Subject Matter Jurisdiction.**

C&W now argues that subject matter was lacking despite averring in its removal notice that the District "Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332." A.14. C&W's subject matter jurisdiction argument is simply a repackaged choice of law argument that it is estopped from making in any event. "The requirement of subject-matter jurisdiction relates directly to the constitutional power of a federal court to entertain a cause of action." Prou v. United States, 199 F.3d 37, 45 (1st Cir. 1999). Federal Courts are conferred with diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332. It is undisputed that when the complaint was filed, Rinsky was a resident of Massachusetts and C&W was a New York corporation. It is also undisputed that the amount in controversy was in excess of $75,000. Therefore, the District Court had subject matter jurisdiction to hear the case, regardless of what law was applied at trial.

### ii. C&W Is Estopped From Arguing That Rinsky Was Not A New York City Employee Entitled To Protection Under The NYCHRL.

C&W waived the impact issue when it sought to apply New York law. C&W tacitly admits that Rinsky's employment at all times was in New York City, and that he was terminated for failing to report to New York City. Interestingly, C&W proceeded under Massachusetts law until its summary judgment motion was denied as to Rinsky's discrimination claims. On the eve of trial, C&W moved for application of New York law. C&W succeeded in persuading the District Court to apply New York law; however, the District Court would not allow C&W to cherry-pick which laws of the jurisdiction would be applied. It therefore applied the law of New York City, where Rinsky reported to at all times, particularly where C&W had taken position throughout the litigation (until now) that Rinsky's job was always located only in New York City. Now, C&W essentially argues that Massachusetts law should apply because Rinsky was physically in Massachusetts when he was informed he would be terminated if he did not return to his job in New York City. This is precisely the type of conduct that judicial estoppel is meant to protect against.

"[C]ourts typically invoke judicial estoppel when a litigant is 'playing fast and loose with the courts.'" Alternative Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). "The equitable doctrine of judicial

estoppel is ordinarily applied to 'prevent[ ] a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding.'" Guay v. Burack, 677 F.3d 10, 16 (1st Cir. 2012) (citation omitted).

"Where one succeeds in asserting a certain position in a legal proceeding, one may not assume a contrary position in a subsequent proceeding simply because one's interests have changed." Id., citing New Hampshire v. Maine, 532 U.S. 742, 749 (2001). "The doctrine's primary utility is to safeguard the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system." Alternative Sys. Concepts, 374 F.3d at 33.

For application of judicial estoppel, it must be shown that the estopping position and the estopped position are "directly inconsistent, that is, mutually exclusive," and that the party being estopped must have "succeeded in persuading a court to accept its prior position." Guay, 677 F.3d at 16. Courts may also consider "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."[6] Id.

[6] Judicial estoppel applies generally to the pursuit of an inconsistent "position," including an inconsistent position "taken by that party's attorney without the party's adopting that 'position' in sworn testimony." Otis v. Arbella Mut. Ins.

Throughout the litigation and at trial, C&W maintained that Rinsky worked in the New York City headquarters of C&W. Among other things, C&W articulated that position as follows:

- "During the entire twenty-[seven] years [Rinsky] worked at C&W, he reported to headquarters in New York City." A.75.
- "By June 22, the decision was made that [Rinsky] needed to be in the New York [City] headquarters on a daily basis…[Rinsky] was given the option to return to New York [City] or resign. [Rinsky] declined to resign, but he did not return to the New York [City] headquarters...[Rinsky] was notified that he had been terminated for job abandonment." A.81.[7]
- "[Rinsky] worked out of the New York [City] office." A.332.
- Rinsky's "job is here in New York [City]. It's still here in New York [City], and [C&W] want[s] you here." A.351.
- Rinsky's "job was always in New York [City]." A.365.
- Rinsky "got fired because he didn't want to come to New York [City], which is where his job had been for 27 years." A.366.

On appeal, C&W is essentially arguing that Rinsky was not an employee of the New York City office; and, therefore, he is

---

Co., 443 Mass. 634, 646 (2005), citing New Hampshire, 532 U.S. at 751-755 and Alternative Sys. Concepts, 374 F.3d at 34.

[7] C&W made further such representations in its memorandum of law in support of its motion for summary judgment, such as "The record is clear that [Rinsky] was required in New York [City] headquarters, as that is where the people who [Rinsky] supported were located," and C&W's "reason for denying the transfer and ultimately terminating [Rinsky] was his refusal to return to New York [City] headquarters to perform his work."

not entitled to the protection of the NYCHRL.[8] It took a directly inconsistent position before and at trial, and persuaded the District Court to apply New York law.[9] It would be beyond unfair to allow C&W to succeed in its "fast and loose" approach on appeal, particularly where it is clear that C&W's intention is to foreclose any remedy for Rinsky.

C&W waived this argument and is estopped from now arguing that Rinsky was anything other than a New York City employee. As a New York City employee, Rinsky was entitled to the protections of the NYCHRL. Accordingly, C&W's jurisdictional argument, and its related arguments concerning the District Court's NYCHRL instructions, should be rejected.

**iii. Subject Matter Jurisdiction Is Not A Question For The Jury.**

C&W takes the illogical and unsupported position that because the jury found for Rinsky on his NYCHRL age discrimination claim, this proves that he was not entitled to protection under the NYCHRL. In that regard, C&W attempts to engage in conjecture to discern the "rational interpretation" of

---

[8] C&W undercuts its own argument repeatedly in its brief, including stating "it was Rinsky who left the New York [City] office of his own volition on May 22, 2015 and never returned, despite [C&W's] requests that he do so." C&W Brief, p. 35, n 11.

[9] There is no allegation, nor could there be, that Rinsky had any relation with Albany County, Nassau County, or any other New York county outside of the five burroughs of New York City such that New York state law would apply instead of the law of New York City. Until its loss at trial, C&W's position was always that Rinsky was an employee in the New York City headquarters, first while living in New Jersey and later Massachusetts.

the verdict. As the District Court noted, the jury was not asked to make any determinations on the issue of impact, and it is "folly" to attempt to discern a factual finding concerning the same. C&W never requested the inclusion of a question on the special verdict form concerning impact (despite seeking numerous other changes)[10], and in fact never raised the issue of discriminatory impact until after the jury's $1.275 million verdict. Accordingly, C&W waived this issue and it is not proper for consideration on appeal.

**iv. Despite C&W's Waiver, Rinsky Satisfied The Impact Requirement For New York City.**

The NYCHRL, as amended, requires that its provisions be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108 (2nd Cir. 2013). Consistent with this, "the impact requirement does not exclude all nonresidents from its protection; rather, it expands those protections to nonresidents who work in the city." Hoffman v. Parade Publications, 15 N.Y.3d 285, 290 (2010) (emphasis added).

"[A] plaintiff's residence 'is irrelevant to the impact analysis.'" Robles v. Cox & Co., 841 F. Supp. 2d 615, 624 (E.D.N.Y. 2012), quoting Hoffman, 15 N.Y.3d at 291. "[T]he

[10] Similarly, C&W's argument that Rinsky failed to prove discriminatory impact to the jury is unsupported and offered only to obscure and conflate the issues on appeal.

relevant location of the injury for purposes of the impact analysis is not the Plaintiff's residence, but the Plaintiff's place of employment.” Id. at 625. In Wexelberg v. Project Brokers LLC, 13 CIV. 7904 LAK MHD, 2014 WL 2624761, at *11 (S.D.N.Y. Apr. 28, 2014), a terminated employee brought claims under the NYCHRL. In denying the defendant’s dispositive motions, the court noted that despite the Hoffman court’s attempt to simplify the jurisdictional analysis, “there are circumstances that may be classified as falling in a grey area.”

The Plaintiff in Wexelberg worked in the defendant’s New York City office for six weeks, and then remotely for five weeks. “[T]he five weeks when plaintiff was not physically located in the New York office, he was working remotely from his home for the New York office.” Id. at *11 (emphasis added). In finding that the plaintiff had made an adequate showing in order to claim under the NYCHRL, the court noted that “this arrangement may present quite a different scenario from the case law that addresses a claim by an employee stationed at an out-of-state office.” Id. Contrast Hoffman, 933 N.E.2d at 748 (resident of Georgia maintaining defendant’s Atlanta office denied NYCHRL protection where his very tangential connection to New York City included only constant communications with defendant’s New York City office and occasional personal visits to that office).

Additionally, the Court in Wexelberg also expressed concern about the "form of victimization" that would result from "the simple stratagem of directing a targeted employee to do his work at home rather than at the New York City office where he normally works, and then terminating him a few days or weeks later," in an attempt to immunize itself from liability under both State and City statutes. Id.

Here, similar to Wexelberg, Rinsky performed work at C&W's New York City headquarters for twenty-seven years. Being lead to believe that he had been granted a transfer, Rinsky began to perform work for the New York City headquarters remotely from the Boston area. Unbeknownst to him, the decision to terminate his employment was made before he had ever left the New York City office.

Specifically, before Rinsky even left for Massachusetts, a six-point plan had been put in place in C&W's New York City office to hire a younger contractor to backfill Rinsky's role, begin knowledge transfer from Rinsky to that contractor, process Rinsky's transfer, retain Rinsky for about nine weeks to cover critical work, and then terminate him. Several weeks later, Rinsky was terminated while in Massachusetts based on the fact that he would not return to his job, which was located in New York City. Thus, the strategy to string along Rinsky and terminate him was devised in New York City while he was working

in that office, sitting in a cubicle not far from the people plotting to discharge him. Further, management undertook this strategy because Rinsky primarily worked on the older AS/400 system, which was being phased out for a newer model.

It would be contrary to the broad and remedial purposes of the NYCHRL, which are to be liberally construed, to deny an employee of New York City for twenty-seven years the protection of its laws based on the fact that, after being duped into believing he had permission to transfer, he received the news of his termination while physically in Massachusetts while performing work for the New York City office. The impact analysis for subject matter jurisdiction was clearly met. Accordingly, the jury verdict and the District Court's judgment should be affirmed.

**v. Application Of Massachusetts Law Would Have Yielded The Same Result.**

The federal harmless error standard has been codified in 28 U.S.C.A. § 2111, stating "[o]n the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."

At the time of his termination, Rinsky was physically in Massachusetts as an employee of C&W in New York City. Accordingly, the only two laws that could have been applied at

trial were the NYCHRL and Mass. Gen. Laws. 151B. In its pretrial filing seeking application of New York law, C&W conceded that "[f]rom a liability standpoint, there is no substantive difference between the elements under Massachusetts law...[and] New York law." A.206-207. The only issue raised was with respect to damages.[11] While the NYCHRL allows for punitive damages, treble damages are available for successful plaintiffs in age discrimination cases under Chapter 151B.

The jury awarded Rinsky $425,000 in compensatory damages and $850,000 in punitive damages; in other words, Rinsky's compensatory damages were trebled. Where the damages were allocated as if the matter had been tried under the circumstances sought in the Appellant's Brief, there can be no prejudice and the verdict should be upheld. See, e.g. Paterakis v. Andrew Najda, et. al., 93 Mass. App. Ct. 1103, 1107-9(2018)(the jury allocated damages proportionately for the harmed partner's share of harm, so a derivative action was not required). As a result, any error with respect to the choice of law would have been harmless, as the substantive law under which liability was determined is the same and the damages awarded

[11] C&W stated it would even agree to the reading of Massachusetts instructions on discrimination liability provided that the mention of punitive damages was removed. A.208.

were the same as would be been awarded under Massachusetts law.[12] Accordingly, where application of the NYCHRL in favor of Massachusetts law did not affect the substantial rights of C&W, this Court should affirm.

**B. The Jury Was Properly Instructed On The Law.**

The District Court issued proper instructions to the jury on Rinsky's NYCHRL age discrimination claim. These instructions were pattern instructions for the NYCHRL. C&W does not seriously dispute these instructions, but rather asserts that the instructions should have been pattern New York state instructions. C&W's argument is a recycled choice of law argument that New York state law should apply without application of the New York City statute, even though Rinsky had no connection with New York state other than in New York City. There simply was no basis to argue that New York state law should apply without application of the NYCHRL. C&W desperately seeks to place the law of this matter in upstate New York, or Massachusetts, in a misguided attempt to avoid the punitive

[12] It should be noted that Chapter 151B allows for treble damages upon a finding that the age discrimination was committed "with knowledge, or a reason to know, that it was a violation of the age discrimination law." The NYCHRL standard for punitive damages is higher, requiring a finding of conduct that is wanton, reckless or malicious. It is beyond question that where the jury awarded punitive damages under the NYCHRL (which trebled the compensatory award), treble damages would have been awarded under the lower Massachusetts threshold.

damages finding by the jury. Therefore, where the NYCHRL was properly applied, the instructions were proper.

**i. The Court's Causation Instruction Was Correct**

"Where 'a party assigns error to the failure to give a requested instruction, the threshold inquiry is whether the requested instruction was correct as a matter of law.'" Franchina v. City of Providence, 881 F.3d 32, 55 (1st Cir. 2018), quoting Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 47 (1st Cir. 2015). Here, the Court's inquiry need progress no further where C&W's requested causation instruction—a state law instruction for a NYCHRL claim—was incorrect as a matter of law.

Under the NYCHRL, a plaintiff must "establish that there was a causal connection between [the] protected activity and the employer's subsequent action, and must show that a defendant's legitimate reason for [his] termination was pretextual or 'motivated at least in part by an impermissible motive.'" Russo v. New York Presbyterian Hosp., 972 F. Supp. 2d 429, 455 (E.D.N.Y. 2013), citing Brightman v. Prison Health Serv., Inc., 970 N.Y.S.2d 789, 792 (App. Div. 2013). C&W concedes that under the NYCHRL, the "motivating factor" instruction was correct. See C&W's Brief, p. 38.

Courts interpreting claims under the NYCHRL have repeatedly rejected the imposition of the "but for" causation standard.

See, e.g. Calhoun v. Cnty. of Herkimer, 980 N.Y.S.2d 664, 667-68 (2014) (stating plaintiff's burden of establishing causation is showing that "the defendant was motivated at least in part by an impermissible motive"); Brightman, 970 N.Y.S.2d at 792 (same); Taylor v. Seamen's Soc. For Children, No. 12-CV-3713, 2013 WL 6633166, at *23 (S.D.N.Y. Dec. 17, 2013) (but for causation standard not applied to claim under the NYCHRL). This is because NYCHRL claims are viewed under a broader interpretation than New York state and federal claims. See Holleman v. Art Crating Inc., 12 CIV. 2719 VMS, 2014 WL 4907732, at *22 (E.D.N.Y. Sept. 30, 2014), citing Mihalik, 715 F.3d at 109. See also Sass v. MTA Bus Co., 6 F. Supp. 3d 238 (E.D.N.Y. 2014) (no error in instructing jury on NYCHRL claim that plaintiff had to prove that "one or more of his protected activities played an important role in defendant's decision to terminate plaintiff," and that "plaintiff's participation in protected activities were more likely than not a motivating factor in defendant's termination of plaintiff.").

If anything, the District Court's instruction provided a higher burden of proof than was necessary and defined motivating factor as "but for" causation.[13] C&W concedes that state law discrimination claims are held to the heightened "but for"

[13] The jury was instructed that "[a]ge and/or disability are determining factors if [Rinsky] would not have been terminated but for his age and/or disability." (emphasis added). A.907.

causation. Therefore, where Rinsky's NYCHRL claim was successful even under this higher standard, any error in the instructions was harmless to C&W. See 28 U.S.C.A. § 2111.

**ii. The Court's Punitive Damage Instruction Was Correct.**[14]

C&W again fails to meet the threshold requirement of establishing that its requested punitive damages instruction was correct. See Franchina, 881 F.3d at 55. The New York Court of Appeals recently confirmed by way of certified question that the punitive damages instruction given by the District Court was correct. See Chauca v. Abraham, 30 N.Y.3d 325 (2017).[15]

In Chauca, it was clarified that "the standard for awarding punitive damages under the NYCHRL is whether the wrongdoer has engaged in discrimination with willful or wanton negligence, or recklessness, or a 'conscious disregard for the rights of others or conduct so reckless as to amount to such disregard." Id. at 334. The District Court instructed the jury as follows:

> you may but are not required to award plaintiff punitive damages if you find the acts of the defendant were wanton and reckless or malicious. An act is

[14] C&W's argument is again flawed where it attempts to ignore application of the NYCHRL, applicable to New York City employees such as Rinsky, in favor of state law.

[15] At trial, the question of the correct punitive damages instruction under the NYCHRL was unresolved among the state courts of New York and had not been clarified by the state's highest court. Accordingly, the District Court was charged with predicting how the state law ambiguity would be resolved. Michalski v. Home Depot, Inc., 225 F.3d 113, 116 (2d Cir. 2000). Based on the ruling in Chauca, the District Court's prediction was correct.

> malicious when it is done deliberately with knowledge of the plaintiff's rights and with intent to interfere fear with those rights. An act is wanton and reckless when it demonstrates conscious indifference and utter disregard of its effect upon the health, safety, and rights of others. If you find that the defendant's acts were not wanton or reckless or malicious, you may not award punitive damages.

Upon review, the consideration must be of "the court's instructions and the wording of the verdict form as a whole." Sanchez-Lopez v. Fuentes-Pujols, 375 F.3d 121, 134 (1st Cir. 2004). The central inquiry is "whether the instructions and verdict form fairly presented the core issues." Uphoff Figueroa v. Alejandro, 597 F.3d 423, 435 (1st Cir. 2010).

Here, the District Court's instructions on punitive damages closely track the standard announced by New York's highest court.[16] If anything, they impose a higher burden for punitive damages than is required.[17] There simply was no error.

**iii. Rinsky's NYCHRL Claim Was Properly Pled.**

An oft-used maxim warns: "Be careful what you wish for; you might receive it." C&W, on the literal eve of trial, demanded

[16] As noted by the District Court, the cases that analyze the NYCHRL punitive damages standard, including Chauca, "do not include even a single mention of either the 'preponderance' or 'clear and convincing standards,'" and that C&W does not cite any cases that support its position that a "clear and convincing" standard must be applied to punitive damages under the NYCHRL. Similarly, any case law that would support this position is absent from C&W's brief.

[17] The District Court also failed to include a New York pattern instruction requested by Rinsky that the jury may properly consider the wealth of the company in awarding punitive damages. Had that been included, the verdict would have been much higher.

application of the law of the jurisdiction of New York. Even though C&W did not even alert the District Court in its request that there are both state and City discrimination laws, after being provided all of the applicable law, it decided to apply the NYCHRL to Rinsky who, by C&W's own position, was always a New York City employee who was never allowed to transfer and was terminated after refusing to report to New York City.

C&W also conflates choice of law with "issues" raised in the pleadings.[18] "A fundamental purpose of pleadings under the Federal Rules of Civil Procedure is to afford the opposing party fair notice of the claims asserted against him and the grounds on which those claims rest." Rodriguez v. Doral Mortg. Corp., 57 F.3d 1168, 1171 (1st Cir. 1995). Regardless of whether the pleadings are amended, "the crucial test is whether the parties have consented to litigation of the issue." Luria Bros. & Co. v. All. Assur. Co., 780 F.2d 1082, 1089 (2d Cir. 1986).

Here, Rinsky's complaint under Massachusetts law raised the issue of age discrimination. There is no argument by C&W, nor could there be, that it was not afforded fair notice of the age discrimination claim plead by Rinsky. Further, it is axiomatic that a party who requests application of foreign law consents to amendment of the pleadings to conform with such law to the

[18] See Fed. R. Civ. P. 15(b)(1)-(2) ("…not within the issues raised in the pleadings…"; "When an issue not raised by the pleadings…").

extent necessary. See Fed. R. Civ. P. 15 (where express or implied consent to try issue exists, "failure to amend does not affect the result of the trial of that issue.").C&W implicitly consented to an amendment of the pleadings to reflect application of the law of New York City. In fact, in response to C&W's request for application of New York law, Rinsky responded that he was amenable to the change from Massachusetts law, so long as the New York City statute was applied. This provided C&W with ample notice and despite this, it did not withdraw its request for application of New York law.

Moreover, C&W did not object at trial to the issues being tried, namely, whether Rinsky was discriminatorily terminated; it thus waived that issue. It only objected to the law that was applied in terms of the New York City statute, rather than New York state law. See Conjugal P'ship v. Conjugal P'ship, 22 F.3d 391, 400-401 (1st Cir. 1994) ("One sign of implied consent is that issues not raised by the pleadings are presented and argued without proper objection by opposing counsel."). Where the NYCHRL was properly before the trial court, and the jury instructions comported with the NYCHRL, there was no error.

### C. The Verdict Was Consistent With The Weight Of The Evidence.

The Court's "review is weighted towards preservation of the jury verdict." Dimanche v. MBTA, 893 F.3d 1, 8 (1st Cir. 2018),

quoting Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 41 (1st Cir. 2002). "Courts may only grant a judgment contravening a jury's determination when the evidence points so strongly and overwhelmingly in favor of the moving party that no reasonable jury could have returned a verdict adverse to that party." Monteagudo v. Asociacion de Empleados del Estado Libre Asociado de Puerto Rico, 554 F.3d 164, 170 (1st Cir. 2009), quoting Marcano Rivera v. Turabo Med. Ctr. P'ship, 415 F.3d 162, 167 (1st Cir. 2005). The Court views the evidence in the light most favorable to the plaintiff and draws all reasonable inferences in his favor. Dimanche, 893 F.3d at 8. "In performing this tamisage '[the Court] may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'" Trainor v. HEI Hosp., LLC, 699 F.3d 19, 26 (1st Cir. 2012), quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987). "A party seeking to overturn a jury verdict faces an uphill battle." Lund v. Henderson, 807 F.3d 6, 12 (1st Cir. 2015) (citation omitted).

C&W's primary argument concerning the sufficiency of the evidence is based on an alleged lack of direct evidence as to C&W's discriminatory intent. It is well understood that "[b]ecause an employer who discriminates is unlikely to leave a 'smoking gun' attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct

evidence, and is usually constrained to rely on circumstantial evidence." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). Indeed, "direct evidence of discrimination is difficult to find precisely because its practitioners deliberately try to hide it." Id. For just these reasons, an analytical framework was developed in order that a jury may infer unlawful discrimination where it rejects an employer's proffered explanation for its adverse employment action. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147-149 (2000). A trier of fact is permitted, but not required, to infer unlawful discrimination where a plaintiff has put forth a prima facie case[19] and sufficient evidence that the employer's justification for its actions was false. See Id. at 148. Under the NYCHRL, a plaintiff may prevail by showing unlawful discrimination was a motivating factor in the decision, if not the sole factor, and that the adverse action was "more likely than not based in whole or part on discrimination." Melman v. Montefiore Med. Ctr., 98 A.D.3d 107, 127 (N.Y. App. Di. 2012).

Here, as noted by the District Court, "the evidence presented at trial strongly suggested that [C&W's] asserted reason for firing [Rinsky] was false." Rinsky was 63 years old. C&W was in the process of phasing out the computer system that

[19] There is no dispute that Rinsky was in a protected class at 63 years old, was qualified to hold his position, was terminated and replaced by an individual approximately 15 years his junior.

was Rinsky’s sole responsibility for twenty-seven years.[20] C&W allowed Rinsky to think he had permission to transfer, while at the same time it was putting together its six-point plan to terminate him after he transferred his knowledge to a significantly younger contractor and moved to Massachusetts. At any time before leaving for Massachusetts, C&W could have simply told Rinsky he did not have permission to transfer, yet it never did. It is clear that C&W’s demand that Rinsky return to New York City was illusory; his replacement had already been hired and plans to terminate Rinsky were already in place. Furthermore, in the years preceding his termination, Rinsky was working three to four days remotely, at the behest of C&W, due to severe space limitations. A jury could have reasonably determined that C&W’s “job abandonment” justification stemming from Rinsky’s failure to report to the New York City office five days per week on one day’s notice was false.

Rinsky was also treated differently than a similarly situated employee, Leiser, who also had requested a transfer to Florida. C&W did not terminate Leiser, but instead asked that

[20] The jury was entitled to draw credibility determinations from witness testimony. For example, at trial, one of C&W’s witnesses that helped engineer Rinsky’s termination initially testified under oath that there were no plans to phase of the AS/400 computer system. Under cross-examination, that witness admitted that this testimony had been false. A.765-766.

his compensation be addressed and eventually accommodated his transfer. Rinsky was terminated.

The jury's punitive damage award was also consistent with the evidence. This Court has stressed that "only infrequently—and then, for compelling reasons—will we, from the vantage point of an algid appellate record, override the jury's judgment as to the appropriate amount of non-economic damages to which a plaintiff is entitled." Monteagudo, 554 F.3d at 174 (citation omitted). "Under New York law, whether to award punitive damages and how much to award are primarily questions which reside in the sound discretion of the original trier of the facts." Greenbaum v. Handelsbanken, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) (internal quotations omitted).

Based on the evidence at trial, a reasonable jury could have found C&W led Rinsky, a 63 year-old employee, down the primrose path, leading him to believe that he had been allowed to transfer, in order to provide a justification for terminating him and replacing him with a substantially younger contractor. This is supported by the numerous emails introduced at trial showing the backroom scheming of C&W regarding how and when to pull the rug out from underneath Rinsky. C&W had every opportunity to inform Rinsky before he moved that his transfer was not approved. It intentionally chose not to, instead plotting his firing while he was still in New York City.

This evidence, whether considered to be willful or wanton negligence, or recklessness, or a conscious disregard for the rights of Rinsky (or all), adequately supported an award of punitive damages. A highly experienced and learned jurist received the verdict from the jury and commented that it demonstrated the result was well reasoned and the evidence was given "careful scrutiny." A.928. Accordingly, the jury's verdict and the District Court's judgment should be affirmed.

## VII. CONCLUSION

WHEREFORE, for the reasons stated herein, Appellee, Yury Rinsky, respectfully requests that this Honorable Court AFFIRM the District Court's judgment in all respects, and award Appellee appellate attorneys' fees and costs in connection with this appeal, along with any other such further relief the Court deems just and proper. Rinsky reserves the right to file a post-decision motion for fees and costs.

Respectfully submitted,
YURY RINSKY,
By his attorneys,

/s/Mark D. Szal

Mark D. Szal, No. 1183731
SZAL LAW GROUP LLC
6 Liberty Square #330
Boston, Massachusetts 02109
Tel: (617) 830-2494
mark@szallawgroup.com

/s/John W. Dennehy
John W. Dennehy, P.C. No. 122802
DENNEHY LAW
127 Main Street, Suite 1
Nashua, NH 03060
(603) 943-7633
(603) 943-7642 (Fax)
jdennehy@dennehylaw.com

DATE: September 6, 2018

## VIII. Fed. R. App. P. 32(g)(1) Certificate of Compliance

1. This document complies with Fed. R. App. P. 32(a)(7) because the principal brief does not exceed thirty (30) pages.

2. This document complies with Fed. R. App. P. 32(a)(5)-(6) because it was prepared using a monospaced typeface, Courier New, in 12 point font.

/s/Mark D. Szal

## IX. CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25(d)(1), I hereby certify that this 6th day of September, 2018, I caused the foregoing to be filed electronically through the Court's ECF filing system. All counsel of record, listed below, are registered with ECF and shall therefore be served operation of the ECF system:

Ralph T. Lepore, Esq.
Benjamin A. McGovern, Esq.
HOLLAND & KNIGHT LLP
10 Saint James Avenue
Boston, Massachusetts 02116
Ralph.Lepore@hklaw.com
Benjamin.McGovern@hklaw.com

Robert R. Berluti, Esq.
Michael A. Bednarz, Esq.
Edward F. Whitesell, Esq.
Berluti McLaughlin & Kutchin LLP
44 School Street, 9th Floor
Boston, Massachusetts 02108
rberluti@bmklegal.com
mbednarz@bmklegal.com
ewhitesell@bmklegal.com

Sawnie A. McEntire, Esq.
Paula D. Taylor, Esq.
Parsons McEntire McCleary & Clark PLLC
1700 Pacific Avenue, Suite 4400
Dallas, Texas 75201
smcentire@pmmlaw.com
ptaylor@pmmlaw.com

/s/Mark D. Szal

## X. Addendum

Trial Exhibit No. 14........................................1

Trial Exhibit No. 11........................................2

Trial Exhibit No. 20........................................3

Trial Exhibit No. 29......................................4-6

Trial Exhibit No. 57.....................................7-11

**From:** Colin Reid
**Sent:** Monday, May 18, 2015 7:41 AM
**To:** Yury Rinsky
**Subject:** RE: Moving to Boston

Ok, we will talk on Tuesday.

---

**From:** Yury Rinsky
**Sent:** Sunday, May 17, 2015 3:59 PM
**To:** Colin Reid
**Subject:** Moving to Boston

Colin,

As discussed I will be moving to Boston on 5/27/2015 for family reasons and need to take 4 personal days after Memorial Day (5/26 – 5/29).

I am confident that I can continue to work to the best of my ability remotely. I look forward to sitting down with you and coming up with an arrangement that benefits all involved.

Thanks

**From:** Colin Reid
**Sent:** Thursday, May 14, 2015 9:55 AM
**To:** Andrew Hamilton
**Subject:** Accepted: AS/400 Resourcing

Colin,
Let's discuss the situation Yury has put us in with his home purchase in Boston.
On the flight up, could you think through the options and risks of replacing him (via contractor or permanent role) so we can evaluate all the pros and cons of keeping and replacing?
Thanks, Andrew

Message

| | |
|---|---|
| **From**: | Andrew Hamilton [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=F5E45C6EC50948769969EB42BFF14E50-ANDREW.HAMILTON@CUSHWAKE.COM] |
| **Sent**: | 5/27/2015 9:07:17 PM |
| **To**: | Leif Maiorini [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7207d05a55394c6689fb7cfd15a5c4c6-Leif.Maiorini@cushwake.com] |
| **CC**: | Colin Reid [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ae8251919ace498cafaf885a195f3d8c-Colin.Reid@cushwake.com] |
| **Subject**: | Next Steps on AS/400 Support |

Leif,

Colin and I reviewed our options with Kat today. Here is what we would like to do:

1. Offer a 6-month extendable opportunity to the resource Colin has worked with previously. The individual working now (Trevor) has multiple clients, can only commit to 20 hours/week, and is uncomfortable working on-site. Cognizant lacks context.

2. Bring the new resource on in the next two weeks to begin KT. We believe we must retain Yury for about 9 weeks to cover critical Workday and MK work.

3. Brief Craig on the situation and prep him for the transfer paperwork from Kat.

4. Process the transfer EAF and take the DTZ review.

5. Assuming approval, execute the transfer officially.

6. Work with Kat as KT unfolds on the official exit (mitigating litigation risks).

Any concerns with this approach?

Regards, Andrew

Andrew Hamilton | Cushman & Wakefield
Managing Director | Enterprise Finance and HR Systems
917-224-0882

Message

| | |
|---|---|
| **From**: | Colin Reid [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=AE8251919ACE498CAFAF885A195F3D8C-COLIN.REID@CUSHWAKE.COM] |
| **Sent**: | 6/2/2015 6:27:11 PM |
| **To**: | Yury Rinsky [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ce36e599c3df438cafff903700d2deb5-Yury.Rinsky@cushwake.com]; Scott Sommer [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=50f226fd32ca4be985a28c1e51f93caa-Scott Somme] |
| **CC**: | Andrew Hamilton [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f5e45c6ec50948769969eb42bff14e50-Andrew.Hamilton@cushwake.com] |
| **Subject**: | RE: Missed conversation with Scott Sommer |

Scott,
Pls wait until I am back in NY tomorrow. Yury might be getting new equipment for Boston, since I have an AS400 consultant sitting there next week.

Andrew,
Pls advise.

Thx.

**From:** Yury Rinsky
**Sent:** Tuesday, June 02, 2015 2:06 PM
**To:** Scott Sommer
**Cc:** Colin Reid
**Subject:** RE: Missed conversation with Scott Sommer

Scott,
I will need my desktop in a couple of weeks when I get a cubical in Boston office.

Thanks

**From:** Scott Sommer [mailto:Scott.Sommer@cushwake.com]
**Sent:** Tuesday, June 02, 2015 1:59 PM
**To:** Scott Sommer; Yury Rinsky
**Subject:** Missed conversation with Scott Sommer

scott.sommer@cushwake.com **[1:57 PM]:**
good afternoon, your desktop is still in NY, do you need it

Message

**From**: Scott Sommer [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=50F226FD32CA4BE985A28C1E51F93CAA-SCOTT SOMME]
**Sent**: 6/2/2015 6:32:53 PM
**To**: Colin Reid [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ae8251919ace498cafaf885a195f3d8c-Colin.Reid@cushwake.com]; Yury Rinsky [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=ce36e599c3df438cafff903700d2deb5-Yury.Rinsky@cushwake.com]
**CC**: Andrew Hamilton [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=f5e45c6ec50948769969eb42bff14e50-Andrew.Hamilton@cushwake.com]
**Subject**: RE: Missed conversation with Scott Sommer

ok

Scott Sommer
Global Information Technology
Office 212-713-6928
scott.sommer@cushwake.com
www.cushmanwakefield.com

**From:** Colin Reid
**Sent:** Tuesday, June 02, 2015 2:27 PM
**To:** Yury Rinsky; Scott Sommer
**Cc:** Andrew Hamilton
**Subject:** RE: Missed conversation with Scott Sommer

Scott,
Pls wait until I am back in NY tomorrow. Yury might be getting new equipment for Boston, since I have an AS400 consultant sitting there next week.

Andrew,
Pls advise.

Thx.

**From:** Yury Rinsky
**Sent:** Tuesday, June 02, 2015 2:06 PM
**To:** Scott Sommer
**Cc:** Colin Reid
**Subject:** RE: Missed conversation with Scott Sommer

Scott,
I will need my desktop in a couple of weeks when I get a cubical in Boston office.

Thanks

**From:** Scott Sommer [mailto:Scott.Sommer@cushwake.com]
**Sent:** Tuesday, June 02, 2015 1:59 PM
**To:** Scott Sommer; Yury Rinsky
**Subject:** Missed conversation with Scott Sommer

scott.sommer@cushwake.com **[1:57 PM]:**
good afternoon, your desktop is still in NY, do you need it

## Angela Li

**From:** Bill Wolf
**Sent:** Sunday, July 05, 2015 6:03 PM
**To:** Craig Cuyar
**Cc:** Katrina Hicks; Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation

Thank you Craig.

Pls let me know if this is a viable option.

Jay might be amenable to renting a residence here and working in NYC at least part time. That would be similar to what we accommodated for Walter Spinrad, whose home was in Vermont, but was in NYC typically 3 days a week - more as necessary.

Jay needs to run the numbers and decide if it makes sense and frankly he'll also be exploring the job market in Florida. But if we go this route, are there any HR or legal guidelines or rules regarding this, such as how many days someone need to be on premise in NYC?

If you don't even want to entertain this option let me or Leif know. Jay will be in tomorrow and I will talk with him.

BTW, I'm not aware of anyone on my team other than Jay asking for something like this – maybe you meant the finance systems team.

Thx

**From:** Craig Cuyar
**Sent:** Friday, July 03, 2015 8:29 AM
**To:** Bill Wolf
**Cc:** Katrina Hicks; Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation

Bill,

Thanks for the additional information and perspectives on Jay. I have considered your request but need to stand firm on the decision to not allow Jay, or others, to relocate at this time. We seem to have a number of requests recently, mostly from the Service Design Team, to work from other locations. These individuals were all hired with full knowledge that their roles were based in New York and accepted our offer of employment. We cannot allow certain Service Design Team members to work from C&W locations in other states while denying similar opportunities for others. I would like for our IT organization to maintain a consistent policy for all employees so that we treat everyone fairly and provide them with the same employment opportunities. This decision is firm and is made with the desire to provide for consistent treatment of staff and to eliminate potential employment disputes and subsequent litigation if we don't.

Regards,

EXHIBIT
PENGAD 800-631-6989
24-Hicks
2/23/17

**From:** Bill Wolf
**Sent:** Thursday, July 2, 2015 12:44 PM
**To:** Craig Cuyar
**Cc:** Katrina Hicks; Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation
**Importance:** High

Craig, I feel I need to ask you to give this request additional thought.

First Jay is a solid, high scoring performer, who works very independently – his team is off shore and his users global. He works right downstairs and we barely see him as is. Other than my stopping by to say Hi, we do everything via mail, IM, and phone. He's a solid .Net guy – perhaps our best. I never even need to intervene with him. He's rock solid and the C&W and Cognizant teams like him a great deal. And he's proactive about learning new things from Capriza, Mobile apps, DevOps, QlikView, you name it - he absorbs stuff, follows through with training and certification tests, and then can actually use what he learns. He can work on anything we have.

Further, this is not a situation like the other IT person who just got up and left. He put in a request for this months ago, with no objections from Leif, myself, or the V&A team. I've even found a desk in Ft Lauderdale, in an office full of appraisers for him.

But primarily my thoughts are that timing of losing him couldn't be at a worse time with the merger activities. Jay's responsible for JobCenter and its various integrations. Assuming we need to integrate the V&A platforms globally, and since John Busi indicates that this what he wants to happen, we really need Jay's help both prior and post-merger. JC3 is the starting point to then integrate V&A's Toolbox, GTT, and Vantage.

Also, the cost and timing of replacing Jay, a very senior .net person, will be high and take time. Even using our most reliable recruiters, we haven't been able to find a willing and decent candidate to replace Dan Akimov, with similar skills, for many months.

The pool of good candidates who will talk to us is dry. The few solid folks we've found, where we've even gotten to the point of making an offer (*great* offers btw), have turned us down due to the merger. This happened trying to replace Dan Akimov as well as Walter Spinrad, the CRM lead. I am not picturing this will change until the dust settles.

**Is there any way to even defer a final decision and at least try this for 6 moths?**

Thanks

**From:** Katrina Hicks
**Sent:** Thursday, July 02, 2015 11:57 AM
**To:** Bill Wolf; Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation

Hi All,

After speaking with Craig, unfortunately this is not a request he is willing to approve at this time. We do not want to set the standard of accommodating personal relocation. Although Jay is a valued employee, the need for his role is based in NYC. We will be unable to continue his employment in FL, can you confirm his official last day?

Thank you,
Kat

**Katrina Hicks**
Human Resources Manager
U.S. Human Resources

Tel: +1 (212) 713-6735
Cell: +1 (347) 260-4081
Fax: +1 (212) 845-6644
D 336735

Katrina.hicks@cushwake.com

CUSHMAN & WAKEFIELD.

Cushman & Wakefield, Inc.
1290 Avenue of the Americas New York, NY 10104

EUROMONEY REAL ESTATE AWARDS 2014

**From:** Bill Wolf
**Sent:** Thursday, July 02, 2015 10:13 AM
**To:** Leif Maiorini; Katrina Hicks
**Subject:** RE: Any progress for Jay Leiser relocation
**Importance:** High

Katrina, can you please let me know ASAP when you have an update?

Jay's last day in NY is today.

**From:** Leif Maiorini
**Sent:** Wednesday, July 01, 2015 2:10 PM
**To:** Bill Wolf; Katrina Hicks
**Subject:** Re: Any progress for Jay Leiser relocation

I have no idea to be honest; he just said that he would cover this with Kat tomorrow.

Take care,

**Leif Maiorini**
Senior Managing Director of IT Strategy, Planning and Applications
Information Technology

**From:** Bill Wolf
**Date:** Wednesday, July 1, 2015 at 11:13 AM
**To:** Leif Maiorini, Katrina Hicks
**Subject:** RE: Any progress for Jay Leiser relocation

Thanks Leif! Any idea what Craig's agreed to? It doesn't seem like this is the case, but I need to be prepared for the risk of Craig's not approving it or making an offer Jay won't accept.

Tomorrow's Jay's last day in NYC. Today if he ends up working from home as it's a half day.

Thx

**From:** Leif Maiorini
**Sent:** Wednesday, July 01, 2015 11:05 AM
**To:** Bill Wolf; Katrina Hicks
**Subject:** Re: Any progress for Jay Leiser relocation

Spoke with Craig a second ago and he will get with Katrina tomorrow regarding Jay.

Take care,

**Leif Maiorini**
Senior Managing Director of IT Strategy, Planning and Applications
Information Technology

**From:** Bill Wolf
**Date:** Wednesday, July 1, 2015 at 11:04 AM
**To:** Katrina Hicks, Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation

Is there any way you (or Leif) might contact Jay to at least let him know there's progress being made?

I don't know what to tell him at this point and he's getting nervous.

Thx for your help.

**From:** Katrina Hicks
**Sent:** Wednesday, July 01, 2015 10:45 AM
**To:** Bill Wolf; Leif Maiorini
**Subject:** RE: Any progress for Jay Leiser relocation

I have a few notes out to Craig on this , I haven't heard back yet.

**From:** Bill Wolf
**Sent:** Tuesday, June 30, 2015 11:05 AM
**To:** Leif Maiorini
**Cc:** Katrina Hicks
**Subject:** RE: Any progress for Jay Leiser relocation

Sorry, I meant to send this to Katrina.

**From:** Bill Wolf
**Sent:** Tuesday, June 30, 2015 11:03 AM
**To:** Leif Maiorini; Vanessa Hairston
**Subject:** FW: Any progress for Jay Leiser relocation
**Importance:** High

Hi, any feedback from Craig on Jay's relocation? He's closing up his house and moving this weekend and is on vacation next week. So with it being a short week here he's done in NYC Thursday.

I found him a desk in Ft Lauderdale office thanks to David Gray. That could work out great for everyone since there are a lot of appraisers there.

Thx

**From:** Jay Leiser
**Sent:** Tuesday, June 30, 2015 10:11 AM
**To:** Bill Wolf
**Subject:** Any progress

Hey Bill.

Any progress with Craig's sign off ?

Thanks

**Jay Leiser**
Senior Software Engineer
**Cushman & Wakefield, Inc.**
**Information Technology**
1290 Avenue of Americas
New York, NY 10104

Phone 212 713 6762
Cell 646 675 9935
Fax 212 845 6651
C&W IT Help Desk 866 427 4485
www.cushmanwakefield.com